# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

ROSEANNE MACMASTER,

                Plaintiff,

   v.

CITY OF ROCHESTER,

           Defendant.

**DECISION AND ORDER**
**05-CV-6509**

## Preliminary Statement

This lawsuit stems from plaintiff Roseanne MacMaster's (hereinafter plaintiff or MacMaster) sixteen years of employment with the City of Rochester (hereinafter "the City"), which ended with her termination on October 29, 2004. Relying on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"), the New York Human Rights Law, 15 N.Y. Exec. Law § 290 et seq. ("HRL"), 42 U.S.C. § 1983 ("Section 1983"), and the First and Fourteenth Amendments, MacMaster alleges in her Second Amended Complaint that during her employment she was subject to gender discrimination, sexual harassment/a hostile work environment and retaliation. (Docket #21). With the instant motion the City moves for summary judgment to dismiss plaintiff's complaint. (Docket #27).[1]

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of this Court for all dispositive matters, including trial. (Docket #19).

## Factual Background

MacMaster was hired to work in the City's Department of Environmental Services, Solid Waste Maintenance Division in 1988. See Defendant's Statement of Facts ("SOF") at ¶ 2 (Docket #28); Affidavit of Roseanne MacMaster at ¶ 2 (Docket #36). During most of plaintiff's employment she worked as a residential refuse collector. See Defendant's SOF, ¶ 10; Plaintiff's 50-h Hearing at pages 11-13 (Defendant's Exhibit A). However, for a three month period in 1990, plaintiff worked in an office support position for Refuse Operations Manager Lou Guilmette. Id. at 15-16. Plaintiff claims that when Guilmette offered her the office position, he told her she was "too pretty" to be working in the field. Id. at 17. Ultimately, plaintiff chose to return to the field working as a refuse collector, in part because Guilmette made her feel uncomfortable. Id. at 29-30. In 2000, plaintiff's responsibilities changed and she worked as a boom truck operator until her termination in 2004. Id. at 13. As a boom truck operator, plaintiff was responsible for picking up large loads that were beyond the capacity of the regular refuse trucks. Id. at 45.

During plaintiff's time as a boom truck operator, Charles Lundy was her direct supervisor. Id. at 46. Karon Simoni, who was the Solid Waste Superintendent, was Lundy's supervisor and both of them were managed by Guilmette. Id. at 63; Plaintiff's Statement of Facts ("SOF") at ¶ 16, 20 (Docket #35).

2

According to plaintiff, the harassment she endured while employed by the City began when she worked for Guilmette in the office in 1990. In her opposition papers, plaintiff details an array of what she perceived to be hostile and discriminatory treatment by Guilmette. The specific facts and circumstances MacMaster relies on in support of these allegations are set forth in detail in the record and include her testimony at the 50-h hearing, her deposition testimony, affidavits and deposition testimony of other City employees and other documentary evidence plaintiff obtained during pretrial discovery. While the Court does not deem it essential to detail herein each and every incident plaintiff raises, the Court will rely on plaintiff's summary of the incidents she found offensive as set forth in Paragraph 50 of her Affidavit. (Docket #36). Examples of the offensive behavior include:

> While working in the office, Guilmette asked her to take a truck out and drop off a dumpster even though such was not within the scope of her office duties. According to plaintiff, Guilmette followed her to the location and then asked her to get something to eat with him. See Plaintiff's 50-h Hearing at pages 23-24.

> Guilmette would often stand behind plaintiff while she worked at her desk "hovering" over her, and frequently touched her shoulder. Plaintiff also alleges that Guilmette, "stalked" her and winked at her. See Plaintiff's 50-h Hearing at pages 27-28; Plaintiff's Dep. Tr. at 62.

> Guilmette went out on plaintiff's route to "check up on [her]" which plaintiff contends was the responsibility of her direct supervisor. According to plaintiff, Guilmette would sit in his car and watch her, which made her

"uncomfortable."   See Plaintiff's 50-h Hearing at page
31-33.

When plaintiff went to department softball games,
Guilmette would "sit right next to [her] like [she] was
his girlfriend" and that made her uncomfortable. See
Plaintiff's 50-h Hearing at page 36-37.

Guilmette ordered plaintiff a red uniform which was
different from the blue uniforms worn by the men and told
her she would "look hot in it." Plaintiff states she was
"shocked" by this. See Plaintiff's 50-h Hearing at page
39-40.

In 1998, when plaintiff announced that she was getting
married, Guilmette called her into his office, "grabbed
[her] hand and said let's see the ring." After her
wedding, Guilmette "turned against [her]" and frequently
wrote her up for poor work performance. According to
plaintiff, she was not written up before she was married,
but was written up ten to fifteen times after she was
married. See Plaintiff's 50-h Hearing at page 43, 46-47,
54.[2]

Guilmette made her try on work pants that were too big
and model them for him. See Plaintiff's 50-h Hearing
(Defendant's Exhibit B) at page 21.

Guilmette sent a picture of plaintiff to his former work
crew in Boston. Id. at 23.

Guilmette did not forward plaintiff compliments he
received about her work. Id. at 24.

Plaintiff went to a restaurant with some coworkers during
a work day and Guilmette stood outside of the restaurant
and watched her. See Plaintiff's Dep. Tr. at page 56
(Defendant's Exhibit C).

According to plaintiff, at some point prior to July 23, 2004,

she complained to the Deputy Commissioner of the Environmental

_____

[2]   It is undisputed that plaintiff incurred a lengthy
disciplinary record while employed by the City. See Plaintiff's SOF
at pages 59-60; Defendant's SOF at page 2.

Services Department, Jerdine Johnson, about the "sexual harassment and retaliation she was suffering by Supervisor Guilmette." See Plaintiff's SOF at ¶ 52.  Plaintiff claims that she "never heard back from Deputy Commissioner Johnson regarding her complaint." Id. at ¶ 53.

However, the record shows that on May 26, 2004, the City's Human Resources Department sent an email to Guilmette to set up a meeting "to discuss recent complaints of harassment received from Ms. MacMaster." See Plaintiff's Volume 2, Exhibit II. Coincidentally, a meeting was already being scheduled to discuss an incident that occurred on May 24, 2004.  On that date, according to plaintiff's direct supervisor Charles Lundy, plaintiff argued with him over the two-way radio about a branch that he had directed her to pick up with her boom truck.  See Defendant's Exhibit G.  Lundy had reprimanded plaintiff the year before because of her alleged inappropriate communication over the two-way radio, which he told her should only be used for brief and direct communications.  See Defendant's Exhibit F; Lundy Aff., ¶ 8-17.  Lundy found plaintiff's conduct on May 24, 2004 to be another infraction of the department's two-way radio policy and he sought a meeting to discuss it with her. See Lundy Aff., ¶ 26-30.

Accordingly, on or about June 2, 2004, Guilmette, Lundy, Deputy Commissioner Johnson, plaintiff and her union representative were all present at the meeting to discuss the two-way radio incident as

well as plaintiff's harassment complaints.   During the meeting,
plaintiff complained that Guilmette harassed her and she left the
meeting.   <u>See</u> Affidavit of Lou Guilmette, ¶ 18.   Guilmette
acknowledges that this made him angry and he announced to those
remaining that he would "fix her ass."[3] <u>See</u> Guilmette Affidavit, ¶9.

On July 23, 2004, Deputy Commissioner Johnson authorized the
issuance of a one-day suspension for plaintiff's alleged
inappropriate use of the radio on May 24th. <u>Id.</u> at ¶ 29.   According
to Guilmette, this discipline was based solely on Lundy's
recommendation.   <u>Id.</u> at 31.   Plaintiff grieved the suspension, and
an arbitrator reversed the suspension, finding that the City "did
not have just cause" to impose the sanction because there was
insufficient evidence that plaintiff "engaged in disorderly conduct
that was disruptive to others." <u>See</u> Defendant's Exhibit L.

Also on July 23, 2004, plaintiff filed a formal written
grievance regarding Guilmette's sexual harassment with the City's
Department of Human Resources.   <u>See</u> Defendant's Exhibit D.
Plaintiff's written grievance includes many of the allegations
listed above.   According to the City's sexual harassment policy,
"[a]ll complaints stemming from incidents of sexual harassment will
be investigated fairly, thoroughly and promptly." <u>See</u> Plaintiff's

---

[3] Guilmette later claimed that when he made that comment, he
meant he would assign plaintiff to a stricter supervisor.   <u>See</u>
Guilmette Affidavit, ¶ 9.

Vol. II, Exhibit G.  However, plaintiff did not hear anything about her complaint in the weeks following her submission of it, nor is there any indication in the record that plaintiff's complaint was promptly forwarded to the City's Diversity Coordinator as required under the City's policy.[4]

On the morning of August 5, 2004, while plaintiff's formal complaint was presumably still pending, Lundy observed plaintiff's car parked in the managers' parking lot and told her not to park there.  According to Lundy, that parking lot was "reserved for managers, building visitors coming for training, ESO's [Environmental Services Operator] on light duty and motorcycles." See Lundy Aff., ¶ 42.  ESO's who were not on light duty, such as plaintiff, were to park in a separate employee parking lot.  Id. at ¶ 43.  According to Lundy, if he had observed other unauthorized cars parked in the managers' lot, he would have instructed them to move too.  Id. at ¶ 42, 45.

Over the course of the next several days, plaintiff continued to park in the managers' lot despite Lundy's repeated directives for her not to park there.  See Lundy Aff., ¶ 41-46.  Plaintiff claimed

---

[4] The policy specifically states that the complaining employee's supervisor must report the complaint to the Diversity Coordinator "when the complaint is made."  See Plaintiff's Vol. II, Exhibit G. The City's policy further states that the "investigation will begin promptly after the complaint is reported.  A preliminary response to the employee filing the complaint will be made within 15 working days after the investigation began, and a final decision will be made within 30 working days."  Id.

that Deputy Commissioner Johnson had given her and other female employees permission to park there a year earlier because several of their cars had been broken into and items were stolen from their purses.  <u>See</u> Plaintiff's Aff., ¶ 80.  Lundy tried to confirm this with Johnson, who denied giving plaintiff permission to park in the managers' lot.  <u>See</u> Lundy Aff., ¶ 48.

On August 10, 2004, Lundy observed plaintiff's car in the supervisor's lot again and directed her to move her car immediately, but plaintiff refused.  <u>See</u> Lundy Aff., ¶ 50-56.  Lundy and plaintiff went to Lundy's supervisor, Karon Simoni, and reiterated their arguments.  <u>Id.</u> at ¶ 57; Plaintiff's Aff. at ¶ 83.  Simoni also directed plaintiff to move her car.  <u>See</u> Lundy Aff. at ¶ 62; Affidavit of Karon Simoni at ¶ 29.  As plaintiff left Simoni's office, both Lundy and Simoni heard her say "fuck this place."  <u>See</u> Simoni Aff. at ¶ 30, Lundy Aff. at ¶ 63.  Plaintiff believed that the directive to move her car was unfair because other female employees in her position were parking in the managers' lot, but were not asked to move their cars.  <u>See</u> Plaintiff's Aff., ¶ 84-86.

According to plaintiff, after leaving Simoni's office, she became "so upset she became visibly sick, had a shaky voice."  <u>Id.</u> at ¶ 88.  She went to the front dispatch window and asked to see Lundy because she "was sick and needed to go home."  <u>Id.</u>  Lundy recalls plaintiff telling him that she was "going out on stress"

because she "couldn't take it anymore." <u>See</u> Lundy Aff. at ¶ 65. Plaintiff obtained her time card and "punched out" of work. <u>See</u> Plaintiff's SOF, ¶ 79-80. Lundy advised Simoni that plaintiff was refusing to work. <u>See</u> Lundy Aff., ¶ 67. Simoni told plaintiff that she did not accept her stress claim and considered her actions a refusal to work. <u>See</u> Simoni Aff. at ¶ 34; Plaintiff's Aff., ¶ 92-93. Simoni told plaintiff that "she was not going home" and that she should go to the Employee Assistance Program for counseling. <u>See</u> Plaintiff's Aff., ¶ 93. According to plaintiff, her sister observed this exchange and called plaintiff's union representatives to come and assist her. <u>See</u> Plaintiff's Aff., ¶ 95. Before the union representatives arrived, plaintiff repeatedly went to the bathroom and vomited because she was so upset. <u>See</u> Plaintiff's Aff., ¶ 96.

In the meantime, Simoni advised Guilmette of the situation. <u>See</u> Simoni Aff. at ¶ 42. Guilmette found plaintiff and told her that she had "two minutes to punch back in" or he would consider it a refusal to work. <u>See</u> Guilmette Aff. at ¶ 36-39; Plaintiff's Aff., ¶ 99. Despite this order, plaintiff left work because she felt ill. <u>See</u> Plaintiff's Aff., ¶ 106. According to plaintiff's union representative, William Slocum, he turned to Guilmette and told him that plaintiff "was going to go home" and asked if Guilmette "had a problem with that" but Guilmette did not respond, as was "typical

9

of [Guilmette's] attitude." See William Slocum Dep. Tr. at page 21 (Plaintiff's Vol. 1, Exhibit D); Affidavit of Angelo Muratore at ¶ 28 (Plaintiff's Vol. 1, Exhibit B). Plaintiff denies that she was disruptive, threatening, abusive or insubordinate during the events on August 10th. See Plaintiff's Aff. at ¶ 223.

The following day, Guilmette sent an internal memo to Rich Saltrelli, Director of Operations, requesting that plaintiff be terminated for her refusal to follow direct orders, using obscene and abusive language and threatening Karon Simoni with physical harm. See Plaintiff's Vol. 2 Exhibit OO. On October 29, 2004, Edward Doherty, the City's Commissioner of Environmental Services sent a letter to plaintiff advising her that she was being terminated from her employment based on her "repeated acts of insubordination" on August 10th. See Plaintiff's Vol. 2, Exhibit U.[5]

Plaintiff grieved her termination and it went to arbitration. After a three-day hearing, the arbitrator issued a decision on December 7, 2005, finding that the City had "just cause" to terminate plaintiff. See Defendant's Exhibit AA; Plaintiff's Vol. 2, Exhibit KK). Specifically, the arbitrator found that there was

---

[5] On October 15, 2004, plaintiff received a letter from the City's Affirmative Action Diversity Officer Tassie Demps stating that an investigation into plaintiff's July 23, 2004 allegations had been conducted, but she found no evidence of workplace harassment or retaliation. See Plaintiff's SOF, ¶ 95; Plaintiff's Vol. 2, Exhibit HH.

> remarkably little conflict on the most crucial
> incident of that morning: the conversation
> between Ms. MacMaster and Mr. Guilmette, the
> top supervisor at the work site.  No matter
> what else occurred that morning, Ms. MacMaster
> knew that Mr. Guilmette's orders would
> supercede any other person's orders or
> permission . . . [s]he was told and said that
> she understood that if she did not begin work,
> it would be considered a refusal to work and
> yet she did not go to work and she did not make
> any explanation to Mr. Guilmette as to why she
> could not or would not work.
>
> This failure to obey a definitive order from
> her highest superior is clearly gross
> insubordination.  Ms. MacMaster's failure to
> obey . . . is a resort to self-help that cannot
> be tolerated in the workplace.

See Arbitrator's Decision at pages 24-5 (Defendant's Exhibit AA).

The arbitrator concluded that plaintiff's refusal to work constituted gross insubordination and that her other "insubordinations" and "disruptive behavior" on that day only served to "exacerbate her misconduct and therefore strengthen the justification for the most severe disciplinary action."  See Arbitrator's Decision at page 29.  The arbitrator found "no evidence that discrimination motivated this specific disciplinary action."  Id. at page 35.

In seeking summary judgment, the City makes three primary arguments:  (1) most of the incidents plaintiff complains about are barred by the applicable statute of limitations; (2) plaintiff's allegations do not amount to a hostile work environment or constitute sexual harassment; and (3) the City did not discriminate

11

or retaliate against her, rather, she was terminated for a legitimate business reason, namely, insubordination. See Defendant's Memorandum of Law at page 1. (Docket #31).


## Discussion

I. Summary Judgment Standard.

The general principles used to evaluate the merits of summary judgment motions are well settled.  Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is warranted where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding a motion for summary judgment, all ambiguities and inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion.  Tomka v. Seiler Corp., 66 F.3d 1295, 1304 (2d Cir. 1995).  While the burden of showing that no genuine factual dispute exists is on the defendant, when faced with a properly supported summary judgment motion, plaintiff must "come forth with evidence sufficient to allow a reasonable jury to find in her favor."  Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001).  "Such an issue is not created by a mere allegation in the pleadings, nor by surmise or conjecture on the part of the

12

litigants." <u>United States v. Potamkin Cadillac Corp.</u>, 689 F.2d 379, 381 (2d Cir. 1982). Finally, "the mere existence of factual issues – where those issues are not material to the claims before the court – will not suffice to defeat a motion for summary judgment." <u>Quarles v. General Motors Corp.</u>, 758 F.2d 839, 840 (2d Cir. 1985) *(per curiam)*.

In evaluating the merits of a summary judgment motion in the context of a discrimination claim, courts must be cautious in granting the relief where the conduct at issue "requires an assessment of individuals' motivations and state of mind" because juries have "special advantages over judges in this area." <u>Brown v. Henderson</u>, 257 F.3d at 251. Nevertheless, "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation." <u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985). "[S]ummary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." <u>Chambers v. TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 40 (2d Cir. 1994). <u>See</u> <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 466 (2d Cir. 2001)("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

II.   <u>Statute of Limitations.</u>

Before analyzing the merits of the various claims alleged by plaintiff, it is necessary to consider which incidents of discrimination alleged by plaintiff are time barred under the applicable statute of limitations.  Where, as here, a plaintiff's allegations of discrimination extend over a lengthy period of employment, "the nature of the claim determines what consideration will be given to the earlier conduct."  <u>Petrosino v. Bell Atlantic</u>, 385 F.3d 210, 220 (2d Cir. 2004).

<u>Title VII Claims</u>:  Under Title VII plaintiff can only recover damages for discriminatory conduct that occurred within 300 days before the filing of a complaint with the EEOC.  42 U.S.C. § 2000e-5(e)(1).   Here, plaintiff filed her EEOC charge on May 18, 2005.  <u>See</u> Plaintiff's Vol. 2, Exhibit C.  Accordingly, as a general matter, any Title VII discrimination claims based on events occurring before July 22, 2004 would be barred by the 300 day limitations period.

<u>A. Hostile Work Environment</u>:  Plaintiff's First Cause of Action is entitled "Discrimination in Employment Under Title VII."   The factual allegations set forth therein specifically allege "sexual harassment through the creation of a hostile work environment."  <u>See</u> Second Amended Complaint at ¶ 19.  The Supreme Court has held Title VII's prohibition of sex discrimination extends to sexual harassment based on a hostile work environment.  <u>Meritor Savings Bank FSB v.</u>

14

Vinson, 477 U.S. 57, 63-68 (1986). Where a plaintiff properly alleges a hostile work environment amounting to sexual harassment, "the statute of limitations requires that only one sexually harassing act demonstrating the challenged work environment occur within 300 days of filing; once that is shown, a court and jury may consider 'the entire time period of the hostile environment' in determining liability." Petrosino v. Bell Atlantic, 385 F.3d at 220, quoting, Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002). Here, plaintiff does point to gender hostile actions occurring after July 22, 2004. Specifically, plaintiff claims that Guilmette's request to terminate her employment was the culmination of what she claims was sexual harassment directed at plaintiff by Guilmette during the course of her employment with the City. Accordingly, I find that plaintiff's hostile work environment claim to be timely filed and to encompass offensive conduct occurring prior to July 22, 2004.

B. Retaliation: Plaintiff's Third Cause of Action is entitled "Retaliation Under Title VII." In this claim plaintiff alleges that the City "engaged in a pattern of illegal retaliation [in violation of Title VII] by failing to take any remedial action whatsoever in regards to her complaints of sexual harassment at the hands" of Guilmette and that after she filed "her formal complaint of sexual harassment" the retaliation "intensified, culminating in plaintiff's termination." See Second Amended Complaint at ¶ 39.

15

It is well settled that an aggrieved employee claiming retaliation must file a charge with the EEOC no later than 300 days "after the alleged adverse act occurs." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 176 (2d Cir. 2005). Here, there is no dispute that plaintiff engaged in protected activity by filing a written harassment complaint against Guilmette and suffered an adverse act (termination of employment) within the 300 day limitation period. Thus, for statute of limitations purposes, plaintiff's Title VII retaliation claim is timely.[6]

Despite the foregoing, the Second Circuit has made clear that even though certain retaliatory conduct may be outside the limitations period, such conduct is not irrelevant to analyzing plaintiff's retaliation claim. "The statute of limitations requires that only one alleged adverse employment action have occurred within the applicable filing period. But, evidence of an earlier alleged retaliatory act may constitute relevant background evidence in

---

[6] Based on the complaint, the record before the Court and the arguments of counsel, the Court views the adverse act at issue here as plaintiff's termination from employment. To the extent plaintiff seeks damages under Title VII for adverse retaliatory acts that occurred prior to July 22, 2004 (should such adverse acts exist), I find they are outside of the Title VII limitations period and may not form the basis for a compensable retaliation claim. See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002)("Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"). However, as set forth herein, such acts may be considered as "background evidence" in considering liability for the timely acts alleged. Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 176-77 (2d Cir. 2005).

16

support of that timely claim.  Hence, relevant background evidence, such as statements by a decisionmaker or earlier decisions typifying the retaliation involved, may be considered to assess liability on the timely alleged act."  Jute v. Hamilton Sundstrand Corp., 420 F.3d at 176-77 (internal quotation and citations omitted).

New York Human Rights Law Claims: Plaintiff's Second and Fourth causes of action allege sexual harassment through the creation of a hostile work environment and retaliation, respectively.  These claims are virtually identical to plaintiff's Title VII claims of the same heading, except they invoke provisions of New York State Human Rights Law (NYHRL).  While identical in substance, the statute of limitations for these state law claims is three years.  Lightfoot v. Union Carbide Corp., 110 F.3d 898, 907 (2d Cir. 1997).  Thus, as to these NYHRL claims, discriminatory conduct within three years from commencement of suit (September 28, 2005) is actionable.

Section 1983 Claims: Plaintiff's Fifth Cause of Action alleges "Sexual Harassment in Violation of the Equal Protection Clause" of the Constitution and her Sixth Cause of Action alleges "Retaliation for Exercise of Free Speech under the First Amendment" of the Constitution.  Both of these claims are raised pursuant to 42 U.S.C. § 1983 and accordingly carry a three year statute of limitations.  Pearl v. City of Long Beach, 296 F.3d 76, 79 (2d Cir. 2002).

III.  <u>Plaintiff's Claims.</u>

The court turns now to the substance of plaintiff's claims.

A.  <u>Sexual Harassment Through Hostile Work Environment</u>: "To prevail on a claim of sexual harassment based on a hostile work environment, a plaintiff must establish two elements: (1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."  <u>Petrosino v. Bell Atlantic</u>, 385 F.3d 210, 221 (2d Cir. 2004)(internal quotation and citations omitted).  <u>See</u> <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 570 (2d Cir. 2000)(plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insults).  To succeed, plaintiff must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive.  <u>See</u> <u>Hayut v. State University of New York</u>, 352 F.3d 733, 745 (2d Cir. 2003).

Whether particular harassment in a given case is "severe or pervasive enough to be actionable depends on the totality of circumstances."  <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d at 570.  The Second Circuit has cautioned trial courts against employing a "mathematical equation of sorts" or trying to "establish an absolute baseline for actionable behavior" in determining summary judgment

18

motions in the context of a hostile work environment claim. <u>Hayut v. State University of New York</u>, 352 F.3d at 746.   Nevertheless, certain factors should be considered in determining whether the plaintiff has met her evidentiary burden on a summary judgment motion, such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with" the victim's job performance.   <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 23 (1993).  Where the record fails to demonstrate that the workplace was permeated with severe and pervasive harassment and discrimination, defendants are properly entitled to summary judgement.   <u>See</u> <u>e.g.</u> <u>Demoret v. Zegarelli</u>, 451 F.3d 140, 150 (2d Cir. 2006)(hostile work environment claim fails because alleged incidents "are insufficient as a matter of law to meet the threshold of severity or pervasiveness required for a hostile work environment").

Viewing the facts in the light most favorable to plaintiff, I conclude that the evidence adduced by plaintiff with respect to a hostile work environment falls far short of demonstrating that her workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.   There are several reasons for this determination.   As a threshold matter, plaintiff "must demonstrate either that a single

incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d at 570 (citation omitted).

None of the incidents in and of themselves are so severe or extreme to meet this test.   Plaintiff concedes that during her employment with the City, Guilmette did not say anything sexual to her (<u>see</u> Plaintiff's 50-h Hearing at page 38; Plaintiff's Dep. Tr. at page 63), did not sexually proposition her (<u>see</u> Plaintiff's Dep. Tr. at page 72) and did not ask her out on a date.   <u>Id.</u>   While telling plaintiff that she "would look hot" in red coveralls and persistently putting his arm on her shoulder while speaking to her in an office setting is indisputably boorish and offensive behavior, it is not, standing alone, so extraordinarily severe as to be actionable under Title VII.   <u>See</u>, <u>e.g.</u>, <u>Weiss v. Coca-Cola Bottling Co. of Chicago</u>, 990 F.2d 333, 337 (7th Cir. 1993)(court upheld district court's grant of summary judgment to defendant, stating that there was no actionable harassment where plaintiff's supervisor asked plaintiff out on dates, called her a "dumb blond," placed his hand on her shoulder several times, attempted to kiss her, and placed "I love you" signs in her work area because incidents were not severe and were relatively isolated);   <u>Saxton v. AT&T Co.</u>, 10 F.3d 526, 534-35 (7th Cir. 1993)(district court affirmed in granting employer's summary judgment motion; supervisor's inappropriate

20

conduct was not so severe or pervasive as to create a hostile work environment where he touched and rubbed plaintiff's leg, pulled plaintiff into a doorway attempting to kiss her, and lurched at her as if to grab her); Inganamorte v. Cablevision Systems Corp., 2006 WL 2711604, *20 (E.D.N.Y. Sept. 21, 2006)(supervisor's staring and winking may have made plaintiff "uncomfortable" but did not rise to the level of a hostile work environment); Gonzalez v. Kahan, 1996 WL 705320, *3-4 (E.D.N.Y. Nov. 15, 1996)(staring "lasciviously" at plaintiff, putting hands on plaintiff's shoulders and asking her to go out was not severe enough to constitute hostile work environment); Lamar v. Nynex Service Co., 891 F.Supp. 184, 185 (S.D.N.Y. 1995)(court found conduct such as touching plaintiff's hand, saying that she looked "hot," and staring at her was "too mild and innocuous to constitute sexual harassment"). See also Alfano v. Costello, 294 F.3d 365, 374 (2d Cir 2002)("Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness.").

Based on the record before the Court, I also determine that the incidents alleged, when considered in light of plaintiff's sixteen year employment history, were not so pervasive or continuous so as create a hostile work environment. It is significant that it is Guilmette alone who is the perpetrator of the harassing behavior. Plaintiff began work with the City in 1988 and only worked under Guilmette's direct supervision for a period of about three months

in 1990 when she accepted a position in the office.  It was during this period that Guilmette asked her to breakfast, "hovered" over her and touched her shoulder.  After three months, plaintiff asked to go back in the field and Guilmette approved her request.  Over the next fourteen years, plaintiff had various job responsibilities, but was never working directly for Guilmette.  On occasions over the next decade, plaintiff alleges that Guilmette engaged in harassing behavior by, *inter alia*, asking her to wear red coveralls because they would make her "look hot", watched her do her job, winked at her often, sent a picture of her to co-workers in Boston, and twice went to the employee softball game and sat next to her.  In 1998, Guilmette asked to see plaintiff because he had heard through co-workers that she was getting married.  According to plaintiff, when she arrived at his office he grabbed her hand and said "let's see the ring" and then said "congratulations."  Plaintiff asked if she could leave and Guilmette said "yes."  See Defendant Exhibit "A" at pages 43-44.

In 2000, plaintiff was promoted to boom truck operator where she remained until her termination in 2004.  Plaintiff testified that during this four year time period Guilmette did not do anything "to make her feel like she was being sexually harassed or that he was trying to pick [plaintiff] up."  See Defendant Exhibit "A" at page 46.  Thus, for the last four years of her employment with the City, plaintiff admits that Guilmette was not sexually hostile or

22

abusive to her.  To meet the threshold of pervasiveness, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002). Viewing the record in a light most favorable to plaintiff, a four year hiatus of affirmative harassing behavior would not support plaintiff's claim of continuous and pervasive sexual harassment in her workplace.

In seeking to avoid summary judgment, plaintiff submitted an affidavit in which she avers that she "was harassed by Supervisor Guilmette during the entirety of my employment with the City, and in particular, during the last five years of my employment, as follows . . ." See McMaster Affidavit at ¶ 50 (emphasis supplied). Plaintiff then lists numerous incidents of harassing behavior to support her claim of sexual harassment within five years of her termination.  It is disturbing that upon checking the citations to the record for the listed incidents of "recent harassment" by Guilmette, the Court finds that almost all of them did not occur in the five years prior to her termination in 2004 and most of them occurred over a decade prior to her termination.  For example, the dumpster delivery incident occurred in 1990 while plaintiff was working in the office (Plaintiff's Dep. Tr. at page 55-56); the touching the shoulder incidents occurred in 1990 while plaintiff was working in the office (Plaintiff's Dep. Tr. at page 62); the claim of "stalking" and "hovering" occurred in 1990 while plaintiff was

working in the office (Plaintiff's Dep. Tr. at page 62); the alleged tendency to touch plaintiff while she was working occurred in 1990 while plaintiff was working in the office (Plaintiff's Dep. Tr. at page 62); the claim that Guilmette suggested that he and plaintiff "could hang out together" occurred in 1990 while plaintiff was working in the office (Plaintiff's Dep. Tr. at pages 63-64); the claim that Guilmette grabbed her hand to look at her wedding ring occurred in 1998 (June 2005 50-h hearing at page 43); the claim that co-workers told her that Guilmette was trying to "get in [her] pants" occurred in 1990 while plaintiff was working in the office (Plaintiff's Vol. II, Exhibit NN); the claim that Guilmette sat next to her at softball games occurred prior to 2000 (June 50-h hearing at pages 35-37); the claim that Guilmette told her she would look "hot" in red coveralls occurred prior to 2000 (June 50-h hearing at 39-40; Plaintiff's Vol. II, Exhibit NN) and other evidence in the record indicates it took place in 1991 or 1992 (Affidavit of Karon Simoni at ¶ 6).  Plaintiff was "not sure" when she found out that Guilmette had sent her picture to his former work crew in Boston. (Plaintiff's Dep. Tr. at page 67).  Put simply, the specific evidence plaintiff points to in support of her claim of "recent" sexually offensive behavior by Guilmette does not, in fact, support her assertion and indeed impugns it.[7]

---

[7] The Court is cognizant that "even in the absence of specific details about each incident," a finding of liability may still result "if a jury were to credit [plaintiff's] general allegations of

The record does not support a finding that discriminatory conduct interfered with plaintiff's work performance either. Plaintiff's explanation for the lack of recent harassing conduct by Guilmette is that he "took offense after I got married" and, instead of seeking her affections, subjected her to discipline because she got married. The record, however, does not support her claim of increasing or disparate discipline. Rather, plaintiff's disciplinary record spans her <u>entire</u> tenure and is not concentrated in her post-marriage work history. Indeed, prior to 1998, plaintiff was reprimanded twelve times for offenses as varied as poor work performance, motor vehicle accidents, excessive use of sick leave and disorderly conduct. <u>See</u> Plaintiff's Affidavit at pages 32-33. These reprimands were initiated by a number of different supervisors besides Guilmette.

Finally, despite claiming that Guilmette subjected her to a severe, pervasive, and abusive working environment for her entire sixteen year career with the City, plaintiff waited until 2004 to file any kind of sexual harassment complaint against him. While the timing of her complaint against Guilmette does not disqualify her from relief, it also is evidence contradicting her allegation that for sixteen years her workplace was permeated with "discriminatory

constant abuse, which were confirmed by her coworkers" or other evidence. <u>Torres v. Pisano</u>, 116 F.3d 625, 631 (2d Cir. 1997). However, plaintiff's allegations of constant sexually offensive conduct by Guilmette over her tenure with the City are not supported by plaintiff's own testimony at her deposition and 50-h hearing.

intimidation, ridicule, and insult," that was "sufficiently severe or pervasive to alter the conditions of the victim's employment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65-67 (1986).

Based on the totality of circumstances, I conclude that plaintiff has not presented sufficient evidence that would allow a reasonable jury to believe that the City unlawfully subjected her to a hostile work environment. Accordingly, the City's motion for summary judgment on plaintiff's First Cause of Action (Title VII Hostile Work Environment) and Second Cause of Action (NYHRL Hostile Work Environment) is granted. See Demoret v. Zegarelli, 451 F.3d 140, 153 (2d Cir. 2006)(The standard for liability for state law claims for hostile work environment is the same as the federal Title VII claims).

B. Retaliation Claims: Title VII prohibits an employer from "discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by" Title VII. See 42 U.S.C. § 2000e-3(a). Plaintiff alleges that she was fired in retaliation for complaining about discrimination by Guilmette.

A claim of retaliation is subject to the familiar burden-shifting analysis used by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996)(applying McDonnell

26

_Douglas_ analysis to retaliation claims). A plaintiff establishes her _prima facie_ case if she can establish that: (1) she engaged in a protected activity by opposing a practice made unlawful by Title VII; (2) the employer was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse action. _Jute v. Hamilton Sundstrand Corp._ 420 F.3d 166, 173 (2d Cir. 2005). Plaintiff's burden in demonstrating a _prima facie_ case has been characterized as "minimal" and "_de minimis_." _Id_. "If a plaintiff sustains the initial burden, a presumption of retaliation arises. In turn, under the second step of the burden-shifting analysis, the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. Finally, as for the third step, once an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." _Id_. (internal citation omitted).

_Prima Facie_ Case: The City does not contest that plaintiff's July 23, 2004 written complaint to the City's Department of Human Resources constituted a "protected activity" of which the City was aware and that plaintiff suffered an adverse employment action in that her employment was terminated on October 29, 2004. Rather, the City claims that plaintiff fails to meet the fourth and final element of a _prima facie_ case because she failed to produce evidence

27

demonstrating a causal connection between her protected activity and her termination.

In terms of her minimal burden to establish a causal connection between her protected activity and her termination, I find plaintiff has met this initial burden.  There are at least two evidentiary bases for this conclusion in the record.  The first is the timing of plaintiff's termination.  The Second Circuit has held a causal connection can be established by showing temporal proximity between the protected activity and the adverse action.  See Manoharan v. Columbia University, 842 F.2d 590, 593 (2d Cir. 1988)("Proof of the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.").

Here, plaintiff alleges that she had verbally complained to Deputy Commissioner Johnson about Guilmette's harassment of her. When she did not receive a response, plaintiff filed with the City's Human Resources Department a formal written complaint of sexual harassment and hostile work environment against Guilmette on July 23, 2004.  Less than three weeks later, Guilmette wrote to his supervisor requesting that plaintiff be terminated for acts of insubordination occurring on August 10, 2004.  That request was granted and plaintiff was terminated.  The fact that Guilmette requested that plaintiff be terminated within weeks of her written complaint of harassment and the City granted that request and

28

terminated plaintiff's employment within three months of filing her complaint establish the requisite "causal connection" for a *prima facie* case of retaliation. See Kessler v. Westchester County Dept. of Social Services, 461 F.3d 199, 210 (2d Cir. 2006)(finding causal connection where supervisor questioned plaintiff's loyalty two months after plaintiff filed a complaint); Feingold v. New York, 366 F.3d 138, 157 (2d Cir. 2004)(two weeks after plaintiff complained of discrimination, his supervisors agreed to recommend his termination); Stephens v. State University of New York at Buffalo, 11 F.Supp.2d 242, 250 (W.D.N.Y. 1998)(four month gap sufficient to establish *prima facie* Title VII retaliation claim).

Second, but equally relevant is Guilmette's ill advised threat to "fix her ass" admittedly made by him on June 2, 2004. Looking at this direct evidence of retaliation in the light most favorable to plaintiff, Guilmette's threat to "fix [plaintiff's] ass" and his closely followed recommendation to fire her certainly support plaintiff's contention that there was a causal connection between plaintiff's protected activity and her subsequent termination from employment.[8]

---

[8] Citing Collins v. New York City Transit Auth., 305 F.3d 113, 115 (2d Cir. 2002) defendant argues that the arbitration decision upholding plaintiff's dismissal prevents plaintiff from demonstrating that there was a causal connection between protected activity and her termination. Collins is certainly relevant to the summary judgment analysis, but is considered by this Court at the third stage of the burden shifting matrix, that is whether plaintiff can demonstrate that retaliation was a substantial reason for her termination. Whether I consider the impact of Collins at stage one (causal

29

Legitimate Non-Retaliatory Reasons for Termination:    In response to plaintiff's *prima facie* showing, the City raises plaintiff's insubordination as its legitimate reason for terminating her.   This non-discriminatory reason is greatly buttressed by the arbitrator, who determined after a full evidentiary hearing, that plaintiff committed "gross insubordination" on August 10, 2004 and that such provided ample justification for her termination.    See Collins v. New York City Transit Auth., 305 F.3d 113, 115 (2d Cir. 2002) (arbitrator's decision "highly probative" in Title VII retaliation claim).   I find that the record before the Court, and particularly the arbitration decision upholding plaintiff's dismissal, to satisfy the City's burden of providing a legitimate, non-discriminatory reason (gross insubordination) for plaintiff's termination.

Pretext: In the final stage of the burden shifting analysis, plaintiff must show that retaliation was a substantial reason for the adverse employment action.   See Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005) (Court considered whether plaintiff demonstrated that retaliation was a "substantial reason" for defendant's adverse actions).

The arbitrator's decision affirming her termination is problematic for plaintiff at this stage as well.   In Collins v. New

---

connection) or stage three (substantial reason) does not change my analysis of whether defendant is entitled to summary judgment.   See Collins, 305 F.3d at 118, n.1.

York City Transit Authority, 305 F.3d 113 (2d Cir. 2002), the Second Circuit held that while "a negative arbitration decision rendered under a CBA [collective bargaining agreement] does not preclude a Title VII action," a decision by an independent and unbiased arbitrator "will attenuate a plaintiff's proof of the requisite causal link" between the protected activity and the adverse employment action. Id. at 119.   Thus, "[w]here an employee's ultimate termination depends upon, and is allowed by, a decision of an independent and unbiased arbitrator based on substantial evidence after a fair hearing, the arbitration decision has probative weight regarding the requisite causal link between an employee's termination and the employer's illegal motive". Id. at 115.

Based on the decision of the arbitrator, and in light of Collins, there can be no dispute that plaintiff was insubordinate on August 10, 2004.   However, the relevant inquiry under the facts here is whether plaintiff's insubordination was an intervening event which breaks any causal connection between plaintiff's complaint of sexual harassment and the City's decision to terminate her employment.   See Yarde v. Good Samaritan Hospital, 360 F.Supp.2d 552, 562 (S.D.N.Y. 2005)(inference of causation defeated due to "substantial intervening events" between the protected activity and the allegedly retaliatory discharge).   Put differently, if plaintiff can demonstrate that the motive behind the events culminating in her insubordinate behavior were indeed retaliatory, she could have a

31

valid cause of action for retaliatory discharge.

This is certainly a case where the parties dispute the relationship between the insubordinate behavior and the adverse employment action which culminated in plaintiff's discharge. Looking at the facts in the light most favorable to plaintiff, the genesis of her insubordination was her repeated refusal to move her car from a restricted parking lot. Believing that she was being treated unfairly because other women were allowed to park in the lot for safety reasons,[9] plaintiff got into a heated argument with two supervisors (Lundy and Simoni) who insisted that she move her car. Plaintiff became increasingly upset to the point of becoming physically ill and felt she had to leave work. She alleges that Lundy told her to go home and obtained her time card for her so she could punch out. Before she could leave, plaintiff claims that Simoni confronted her and told her she could not go home, but was required to go to the Employee Assistance Program (EAP) for counseling. Plaintiff tried to walk away from Simoni, but Simoni continued the confrontation. Plaintiff asked for the help of her union representatives who were immediately summoned. While awaiting their arrival, plaintiff went to the bathroom and vomited because she was so upset. Meanwhile, Guilmette arrived on the scene. Union representative William Slocum turned to Guilmette and told him that

---

[9] See Affidavit of Mary Taggart at ¶ 37-42 (Plaintiff's Vol. 3, Exhibit G); Plaintiff's Affidavit at ¶ 80-84.

32

plaintiff "was going to go home" and asked if Guilmette "had a problem with that" to which Guilmette did not respond. <u>See</u> William Slocum Dep. Tr. At page 21. Union representative Angelo Muratore, who was also present during this encounter, stated that Guilmette's non-responsive reaction was "typical of his attitude." <u>See</u> Affidavit of Angelo Muratore at ¶ 28.

Despite the fact that Lundy had told plaintiff she could punch out and go home, Guilmette told plaintiff she had two minutes to "punch back in" and to get in her truck or he would consider it a refusal to work. Much of plaintiff's version of events, including the fact that Lundy told plaintiff she could go home and allowed her to punch out, is corroborated by the testimony and affidavits of Union Representatives Bill Slocum, Angelo Muratore, and Darlson Rupert. <u>See</u> Affidavit of Angelo Muratore at ¶ 20-23; Affidavit of Darlson Ruppert at ¶ 11-13.[10] These individuals also confirm that many employees park in the restricted managers' lot without consequence or disciplinary action.

After speaking with her union representatives, plaintiff went home. The next day, Guilmette wrote a memorandum to the City's Director of Operations <u>requesting that plaintiff be terminated</u>.

---

[10] To be sure, there are critical factual disputes between plaintiff's version of the events on August 10th and Guilmette's. Indeed, the arbitrator found that "[t]he testimony concerning the interaction between the union representatives and Mr. Guilmette is so different that the versions are not reconcilable." <u>See</u> Arbitrator's Decision at page 11. However, it is not the role of the Court to resolve such disputes on a summary judgment motion.

Guilmette's request that plaintiff be fired comes within a few months of Guilmette (1) being verbally advised by plaintiff that she believed Guilmette was sexually harassing her and threatening to "get her ass" after being so advised[11] and (2) within three weeks of plaintiff filing a formal complaint of sexual harassment with the City's personnel department.  While the arbitrator found plaintiff was insubordinate by refusing to comply with Guilmette's order to "get in her truck" and return to work, there is nothing in the arbitrator's decision to suggest he was aware of Guilmette's previous threat to "get [plaintiff's] ass" or plaintiff's recently filed charge that Guilmette was sexually harassing her.[12]  Nor does the arbitrator consider whether Guilmette's "get back to work" ultimatum to plaintiff on August 10th was an attempt to bait plaintiff into insubordination, thereby providing him with a basis for requesting her termination as retaliation for her complaints against him.

In sum, whether Guilmette's request that plaintiff be terminated was truly motivated by the events of August 10, 2004 or instead was in retaliation for her accusations of sexual harassment against him is an issue fact.  Viewing the disputed facts in a light

---

[11] See Affidavit of Anthony Muratore at ¶ 13-15 (Plaintiff's Vol. 3, Exhibit C).

[12] Indeed, in his decision the Arbitrator noted: "It is not within my province to determine the question of whether the Employer's actions over a period of time might constitute harassment."   See Arbitrator's Decision at page 33.

most favorable to plaintiff, a reasonable jury could conclude that Guilmette's response to plaintiff's conduct on August 10, 2004 and his written request the following day that she be fired was excessive and motivated by retaliatory animus. <u>See</u> <u>Feingold v. New York</u>, 366 F.3d 138, 155-56 (2d Cir. 2004)(court rejected "intervening event" argument finding that reasonable jury could conclude that defendant's reason for terminating plaintiff was pretextual because others were not similarly disciplined for like conduct). Based on the record, plaintiff has produced sufficient evidence for a reasonable jury to conclude that defendant's stated reason for her termination was a pretext for unlawful retaliation. Accordingly, defendant's motion for summary judgment as to plaintiff's Title VII and NYSHRL retaliation claims is denied.

<u>C. Section 1983 Claims</u>: Plaintiff invokes 42 U.S.C. §1983 to allege two distinct constitutional violations - denial of free speech and equal protection. These claims are discussed separately below.

<u>1. First Amendment Retaliation Claim</u>: To establish a First Amendment retaliation claim, plaintiff must demonstrate that "(1) his speech addressed a matter of public concern, (2) he suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action, so that it can be said that his speech was a motivating factor in the determination." <u>Cobb v. Pozzi</u>, 363 F.3d 89, 102 (2d Cir.

2004)(citation and internal quotation omitted).    In moving for summary judgment, defendant argues, *inter alia*, that plaintiff's "speech" was not protected because it did not address a matter of public concern.  For the reasons that follow, I agree.

It is well settled that "[p]ublic employees do not surrender their First Amendment rights to comment on matters of public interest by virtue of their acceptance of government employment." Cobb v. Pozzi, 363 F.3d at 101.   Nevertheless, "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Connick v. Myers, 461 U.S. 138, 147 (1983). While the determination of whether speech constitutes a matter of public concern "may be somewhat fact-intensive, it presents a question of law for the court to resolve." Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003).   The "public concern" requirement applies to both freedom of association claims and retaliation claims.  Cobb v. Pozzi, 363 F.3d at 102-07.

"Under the public concern doctrine, when 'expression cannot be fairly considered as relating to any matter of political, social or other concern to the community,' but is simply a personal matter, it is not afforded First Amendment protection." Garcia v. S.U.N.Y.

Health Sciences Center, 280 F.3d 98, 105-06 (2d Cir. 2001) quoting
Connick v. Myers, 461 U.S. at 146.   Thus, where complaints are
"personal in nature" and "generally relate to [the employee's] own
situation," the public concern requirement has not been satisfied.
Ezekwo v. New York City Health & Hospitals Corp., 940 F.2d 775, 781
(2d Cir. 1991).

     Viewed under this standard, plaintiff has failed to demonstrate
that her speech was a matter of public concern.   To be sure,
"[g]ender discrimination in employment is without doubt a matter of
public concern."   Konits v. Valley Stream Cent. High School Dist.,
394 F.3d 121, 125 (2d Cir. 2005).   But a public employee does not
automatically meet the "public concern" requirement simply by filing
a claim of gender discrimination with her employer where the
complaint is focused purely on personal grievances in the workplace.
See, e.g., Nair v. Oakland County Community Mental Health Authority,
443 F.3d 469, 478 (6th Cir. 2006)(where plaintiff's complaint
"focuse[d] on the reduction of [his] responsibilities and hours, not
those of anyone else" and did not address any issues of public
health, court dismissed his First Amendment claim);   Collins v.
Allen, 2006 WL 2505928, *7 (S.D. Ohio Aug. 29, 2006)(where
plaintiff's sexual harassment complaints did not allege any pattern
of discrimination by her employer but were "directed at her own job
conditions, and were made to protect her own self-interest" court
rejected First Amendment claim);   Oppenheim v. Gutteridge, 225

F.Supp.2d 185, 189 (D. Conn. 2002)(where "all [plaintiff] complained about was her own dissatisfaction with the way she personally was being treated by [her supervisor]," First Amendment retaliation claim failed). <u>See</u> <u>also</u> <u>Lewis v. Cowen</u>, 165 F.3d 154, 164 (2d Cir. 1999)("speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of public concern"); <u>Saulpaugh v. Monroe</u> <u>Community Hospital</u>, 4 F.3d 134, 143 (2d Cir. 1993)(Plaintiff's retaliation claim fails because her complaints to the union were "personal in nature and generally related to her own situation").

The record before this Court establishes that plaintiff's complaints about Guilmette were motivated by plaintiff's personal interests and anger and not some unselfish desire to protect the public or improve working conditions for female employees of the City.  As such, her speech  was personal in nature, intended to remedy her own working conditions and did not pertain to a matter of public concern.  <u>See</u> <u>Alexander v. City of New York</u>, 2004 WL 1907432, *13 (S.D.N.Y. Aug. 25, 2004)(A First Amendment retaliation claim is "narrower in scope than a Title VII retaliation claim in that, for purposes of a First Amendment retaliation cause of action, complaints about individual acts of discrimination or harassment are not generally deemed to be of 'public concern.'").  For this reason, defendant's motion for summary judgment as to plaintiff's Sixth cause of action is granted.

2. Fourteenth Amendment Equal Protection Claim: The Fourteenth Amendment Equal Protection clause "essentially direct[s] that all persons similarly situated should be treated alike." Casolare v. County of Onondaga, 2006 WL 1877139, *13 (N.D.N.Y. July 6, 2006), quoting City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. 432, 439 (1985). Accordingly, the Second Circuit has held that sex discrimination, including sexual harassment and hostile work environment, is actionable under § 1983 as a violation of equal protection. See Kern v. City of Rochester, 93 F.3d 38, 43 (2d Cir. 1996); Annis v. County of Westchester, 36 F.3d 251, 254 (2d Cir. 1994). Once § 1983's requirement of "action under color of state law" is established, plaintiff's equal protection claim will parallel her Title VII claim and the claims "must stand or fall together." Casolare, 2006 WL 1877139 at *13, quoting Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004).

Here, given that plaintiff's Title VII discrimination claim for sexual harassment/hostile work environment has been dismissed, plaintiff's Fourteenth Amendment Equal Protection claim must also fail. See Demoret v. Zegarelli, 451 F.3d 140 (2d Cir. 2006)(court dismissed Fourteenth Amendment and Title VII discrimination claims). Accordingly, defendant's motion for summary judgment as to plaintiff's Fifth cause of action is granted.

## Conclusion

Based on the foregoing, the City's motion for summary judgment is **granted in part and denied in part**. Plaintiff's First, Second, Fifth and Sixth Causes of Action are dismissed with prejudice and on the merits. Plaintiff's Third and Fourth Causes of Action based on plaintiff's state and federal retaliation claims survive defendant's motion for summary judgment. Counsel shall appear for a trial date status conference on **November 19, 2007 at 11:00 a.m.**

**SO ORDERED.**

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Date: September **28** , 2007
Rochester, New York