UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ROSEANNE MACMASTER,

        Plaintiff(s),                  DECISION AND ORDER
v.                                           05-CV-6509

CITY OF ROCHESTER,

        Defendant(s).
_____

## Preliminary Statement

Between April 21, 2008 and April 24, 2008, this Court presided over a jury trial on plaintiff's Title VII and New York Human Rights Law retaliation claims. Prior to the case being submitted to the jury, the parties stipulated that should the jury return a verdict finding the City of Rochester liable on plaintiff's retaliation claims, plaintiff would be entitled to back pay in the amount of $78,765.66. The parties further stipulated that the Court would decide issues associated with reinstatement and/or front pay based on the proof adduced at trial.

On April 24, 2008, the jury returned a verdict (Docket #65) finding that the plaintiff's recently filed complaint of sexual harassment against her supervisor was a motivating factor in the defendant's decision to terminate her employment and thus found in favor of plaintiff on both her federal and state retaliation

claims.[1] By Decision and Order filed September 10, 2008, the Court issued a decision on the front pay issue and ordered plaintiff to be reinstated to her former position with the City. (Docket #78).

Presently before the Court is defendant's post-trial motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure ("FRCP"), or for a new trial pursuant to FRCP Rule 59(a). (Docket #77). Plaintiff filed opposition papers to defendant's motion (Docket #80), and the defendant filed reply papers (Docket #82). On November 25, 2008, the Court held a hearing and heard oral arguments from both parties.

## Discussion

A. The Applicable Legal Standards: The legal standards for evaluating the merits of defendant's post-trial motions are well established. In ruling on defendant's Rule 50(b) motion for judgment as a matter of law ("JMOL"), this Court "is required to deny the motion unless, viewed in the light most favorable to the nonmoving party, the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight

---

[1] New York courts have uniformly applied federal law in evaluating claims of retaliation and hence federal law is applied here in determining plaintiff's Title VII and New York Human Rights Law retaliation claims. See Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1177 (2d Cir. 1996).

of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." Sir Speedy, Inc. v. L&P Graphics, Inc., 957 F.2d 1033, 1038-39 (2d Cir. 1992) (internal citations and quotations omitted); see Weldy v. Piedmont Airlines, Inc., 985 F.2d 57, 60 (2d Cir. 1993) (because the trial judge "cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute [his or her] judgment for that of the jury," the nonmoving party "must be given the benefit of all reasonable inferences" in Rule 50(b) motion determinations)(citation omitted). The standard for a new trial pursuant to FRCP Rule 59(a) is "less stringent" than the Rule 50 standard in that the court (1) does not have to view the evidence in the light most favorable to the winner; (2) may weigh the evidence as it deems appropriate, and (3) can grant the motion even if there is substantial evidence supporting the jury's verdict. Manley v. AmBase Corp., 337 F.3d 237, 244-45 (2d Cir. 2003). Nevertheless, even under Rule 59, this Court may not grant a new trial unless it concludes that the jury has "reached a seriously erroneous result" or the verdict is against the weight of the evidence so as to be a "miscarriage of justice." Id. (citations omitted).

B. The Defendant's Arguments: The basis for the City of Rochester's post-trial motions is twofold. First, the City argues that "there was no legally sufficient evidentiary basis

3

for a reasonable jury to find that Plaintiff had a 'good faith, reasonable belief'" that the underlying employment practice was unlawful. Defendant's Memorandum of Law annexed to Docket #77 at p. 8. Second, defendant argues that in light of the arbitrator's decision, plaintiff "failed to offer evidence to show a causal connection between her termination and the protected activity." Id. at p. 12.

Good Faith, Reasonable Belief: To prevail in a retaliation claim, plaintiff must have engaged in "protected activity" under Title VII. Section 704(a) of Title VII reads, in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of [its] employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). Complaints to management as to discrimination based on gender or claims of sexual harassment are protected activities under Title VII and remain so "even when the underlying conduct complained of was not in fact unlawful 'so long as [the plaintiff] can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law.'" Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002)(quoting Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir.

4

1999); see Wimmer v. Suffolk County Police Dep't, 176 F.3d 125, 134 (2d Cir. 1999)(to prevail in a retaliation claim, plaintiff "need not prove that the conditions against which he protested actually amounted to a violation of Title VII," rather only that he had a "good faith, reasonable belief" that the employer had violated the law)(citations omitted).

To be sure, the City's primary trial defense was that plaintiff did not engage in protected activity when she complained to the City about her supervisor's conduct. In his summation, defense counsel argued at length that the "evidence that was presented at trial demonstrated that plaintiff did not have a good-faith reasonable belief that she was being sexually harassed" and that "the only reason she made her complaint [of discrimination] was to try to get out of accountability for her own acts of misconduct." April 24, 2008 Trial Transcript ("TT") at p. 20-21. Moreover, the Court instructed the jury that, in order to meet her burden of proving that she had engaged in protected activity, plaintiff must demonstrate "that at the time she filed her complaint with the City she had a reasonable good-faith belief she was being or had been subjected to unlawful sexual harassment." Id. at p. 51.[2]

---

[2] The defendant did not object to the retaliation charge as given by the Court. See April 24, 2008 TT at p. 2, 56.

5

The verdict pays tribute to the jury's factual determination that plaintiff's beliefs were reasonable and held in good faith. Although the Court does not deem it necessary to recapitulate the entire trial record, suffice it to say there was evidence presented to the jury upon which such findings could reasonably be supported. As a long time employee of the City, plaintiff had numerous encounters with the supervisor at issue, Lou Guilmette, throughout her career. Plaintiff testified that early in her career Guilmette sought to date her, asking her out for lunch or dinner. See April 22, 2008 TT at p. 92. Guilmette gave her tight shirts to wear and a bright red jumpsuit that was different than male employees wore. See id. at p. 87. Plaintiff testified that, more recently, Guilmette had started following her and taking pictures of her. See id. at p. 110. After she rejected his advances, plaintiff testified that Guilmette began a campaign of retaliating against her, causing her to be "written up" for what she believed were unjustified or picayune infractions that other employees were not being disciplined for. See id. at p. 88-89. Matters began to come to a head in 2003 when Guilmette called plaintiff to a meeting to discuss "radio conduct" and told her that he did not like her "tone of voice on the radio." Id. at p. 90. Plaintiff responded by telling Guilmette that she felt he was harassing her in retaliation for rejecting him. See id. at p. 92.

After her meeting with Guilmette, plaintiff testified that she was subjected to further disciplinary complaints and she complained to Anthony Muratore, the union steward in the City's refuse department. See id. at p. 87-88. Muratore testified that plaintiff "felt that Lou was singling her out because, you know, he had made advances toward her in the past since she had been there, and she wasn't feeling good about it. She was really stressed out over it." April 21, 2008 TT at p. 100. Muratore suggested setting up a meeting with Guilmette to discuss her concerns and to "see if we could smooth it over, and make her feel better about being at work." Id.

Muratore testified about two meetings he convened between plaintiff, Guilmette and Charles Lundy, another supervisor in the refuse department. See id. at p. 101-103. Muratore testified that at the first meeting plaintiff "laid that all out on the table, that she felt she was being singled out because she wasn't going along with his advances, and she became visibly upset and started crying, shaking, and pretty much Lou [Guilmette] ended the meeting after she pulled out the red jumpsuit. He became angry, very red faced, and glowing." Id. at p. 102. At the second meeting, plaintiff again reiterated her belief that Guilmette was singling her out for unfair discipline. See id. at p. 108. Guilmette again became mad and asked Lundy and plaintiff to leave the room. See id. at p. 108-109. Once they left,

Muratore testified that Guilmette said he was "going to get her [plaintiff's] ass and transfer her." Id. at p. 109. Guilmette himself testified that based on what happened at the meeting, he thought plaintiff's "attitude needed adjustment." April 23, 2008 TT at p. 72. Guilmette conceded that he informed Muratore that he was going to "fix her [plaintiff's] ass" by transferring her to a new supervisor. Id. at p. 77.

According to Muratore, "[t]hings got worse" after the second meeting with Guilmette and Lundy, and he "feared that she was going to lose her job" because Guilmette "wanted revenge on her for not being able to take her out or her going along with whatever he had planned for her." April 21, 2008 TT at p. 109-110. Another meeting was held on May 26, 2004 with plaintiff, Muratore and various members of the City Administration, including the Deputy Commissioner, during which plaintiff reiterated her complaints about Guilmette sexually harassing her. See id. at p. 110-111. Muratore testified he and plaintiff were asked to leave the meeting for about ten minutes and when they returned they were assured that plaintiff's complaints about Guilmette were discussed and addressed, and they offered to refer plaintiff to the City's Employee Assistance Program. See id. at p. 111.

On July 23, 2004, plaintiff filed a formal complaint of sexual harassment against Guilmette with the City's Human

8

Resources Department. See Trial Exhibit 7. Plaintiff supplemented her complaint with additional information on August 10, 2004. See Trial Exhibit 8. In testimony which the jury could have reasonably found to be favorable to the plaintiff, Tassie Demps, the City's Affirmative Action and Diversity Officer, testified that plaintiff's complaint of sexual harassment and retaliation was not processed or investigated in strict accordance with written protocols and procedures given to City employees with respect to complaints of sexual harassment. See Trial Exhibit 5.[3]

The events of August 10, 2004 were testified about at length during the trial. For purposes of this motion, it is sufficient to state simply that plaintiff was told by Charles Lundy that she had to move her car from the supervisors' parking lot. Believing that other women were allowed to park in the restricted lot and she was again being treated unfairly, plaintiff became extremely

---

[3] For example, Demps was either not aware of or not enforcing the written policy requiring supervisors who were aware of a sexual harassment allegation to report that allegation to her. See April 21, 2008 TT at p. 148-150. The City's written policy contemplates an immediate investigation and the issuance of a preliminary response to the employee within 15 days. Under the policy, a final decision on the complaint will be made within 30 days. Demps apparently did not provide plaintiff any preliminary response to her complaint (see April 21, 2008 TT at p. 161) and did not provide the final decision on her complaint until October 15, 2004 (see id. at p. 156), almost three months after plaintiff filed her initial complaint with Human Resources. Demps testified that some of the information in plaintiff's written materials was illegible and she needed further information from plaintiff to complete her investigation.

upset, began to get "physically sick" and vomited. See April 22, 2008 TT at p. 96-97. Plaintiff told her immediate supervisor she wanted to leave work and take a sick day or vacation day. Eventually Guilmette was summoned. Plaintiff testified that Guilmette told her she had "five minutes to get in your truck ... and get on the road." Id. at p. 99. Plaintiff told Guilmette she was sick and was going home. Plaintiff left work. Unbeknownst to plaintiff, the following day Guilmette sent an internal memorandum to his supervisors requesting that plaintiff be terminated. See id. at p. 47.

Plaintiff left work on August 10, 2004, but reported and worked the next several days without incident. Within a few days, however, plaintiff injured her shoulder on the job. See id. at p. 100. Plaintiff testified that although she wanted to try and continue working, the "City doctor" placed her on medical leave and she was paid under Workers Compensation. See id. at p. 101. On October, 15, 2004, while she was on medical leave due to her shoulder injury, plaintiff received a letter from Demps notifying her that the City's investigation into her sexual harassment complaint had been completed and no harassment was found. See id. at p. 101-102. Twelve days later, plaintiff was notified that she was fired because of her acts of insubordination occurring on August 10, 2004. See Trial Exhibit 1.

In support of her claim of retaliation, plaintiff presented to the jury evidence of other disciplinary measures short of termination given to other employees accused of insubordination or other serious workplace offenses. See Trial Exhibit 4. The jury also heard the testimony of Union Vice-President Angelo Muratore, who testified that plaintiff was being "treated differently than others." See April 22, 2008 TT at p. 23. Muratore, who had been associated with the Union for twenty-five years, testified: "It's my own opinion, but by what I seen [sic] on how other people were treated and how she was treated, it's way off base. Way off base." Id. at p. 38.

Measuring the jury's verdict under the Rule 50 standard yields the conclusion that the City's motion must be denied. Viewing the trial testimony in the light most favorable to plaintiff, the jury's determination that plaintiff reasonably and in good faith believed that she was a victim of sexual harassment and discrimination by Guilmette at the time she made her complaints to the City was a reasonable determination. The facts do not demonstrate that plaintiff's belief was "irrational" nor "was [it] a conclusion that reasonable persons could not have reached." Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1179 (2d Cir. 1996)(rejecting defendant's argument that the jury erred in finding that plaintiff had a reasonable, good faith belief that she was a victim of a hostile work environment).

Moreover, contrary to the arguments of the City, the fact that this Court granted the City's motion for summary judgment on plaintiff's substantive claims of employment discrimination does not preclude plaintiff from prevailing on her claim of retaliatory discharge. Wood v. Pittsford Cent. Sch. Dist., No. 07-0892-cv, slip op., 2008 WL 5120494, at *1 (2d Cir. Dec. 8, 2008)(summary order). Of course, the record before the Court on a summary judgment motion is not the same as the record before the jury after a full trial on the merits. But more fundamentally, plaintiff need not establish that Guilmette sexually harassed her to convince the jury that she had engaged in a protected activity under Title VII. "[A] mistake as to the merits of a complaint does not cost an employee the protections of Title VII." Firestine v. Parkview Health Sys., Inc., 388 F.3d 229, 234 (7th Cir. 2004). Rather, "[o]nly a groundless claim resting on facts that no reasonable person possibly could have construed as a case of discrimination could not constitute a statutorily protected activity." Id. (internal quotations and citation omitted); see Lown v. Salvation Army, Inc., 393 F. Supp. 2d 223, 255 (S.D.N.Y. 2005)("[P]laintiffs need not possess scholarly familiarity with antidiscrimination law in order to satisfy the requirement that they believed in good faith that they had suffered unlawful discrimination."); Iannone v. Frederic R. Harris, Inc., 941 F. Supp. 403, 410 (S.D.N.Y. 1996)("[A] good

faith mistake, whether of fact or law, regarding the legality of the employer's conduct will not strip the plaintiff of Title VII protection against retaliation."). The City argues that "[a]s a matter of law making a complaint many years after the incidents alleged does not constitute a good faith, reasonable belief" of discrimination. Defendant's Memorandum of Law annexed to Docket #77 at p. 8. However, the fact that most of the incidents of actual harassment were remote in time does not mean that plaintiff could not have reasonably believed that Guilmette was now retaliating against her for rejecting his advances. In sum, I find it was reasonable for the jury to decide that plaintiff reasonably and in good faith believed she was the victim of a hostile work environment and retaliatory discipline.

Causal Connection: The City also argues that it is entitled to JMOL because plaintiff failed to offer evidence "of causation linking her termination to motives of retaliation and discrimination." Defendant's Memorandum of Law annexed to Docket #77 at p. 13. Given the trial evidence, this argument is similarly unpersuasive. "Proof of the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988).

Here, the City permitted a supervisor who was under active investigation for sexually harassing an employee to initiate and participate in the decision to terminate the complaining employee. The formal harassment complaint against Guilmette was filed on July 23, 2004. Less than three weeks later, Guilmette recommended that plaintiff be terminated and the City ultimately adopted that recommendation. Put simply, the timing of plaintiff's termination and the direct involvement of Guilmette in the termination recommendation supported a finding of causal connection. See Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 210 (2d Cir. 2006)(finding causal connection where supervisor questioned plaintiff's loyalty two months after plaintiff filed a complaint); Feingold v. N.Y., 366 F.3d 138, 156-57 (2d Cir. 2004)(fact that two weeks after plaintiff complained of discrimination his supervisors agreed to recommend his termination is evidence of causal connection); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998)(causal connection requirement satisfied where plaintiff's discharge came less than two months after one complaint and just ten days after another).

The fact that plaintiff was later found by the arbitrator to be insubordinate also does not immunize the City from liability for retaliatory discharge. Title VII "is violated when a retaliatory motive plays a part in adverse employment actions

toward an employee, whether or not it was the sole cause. In addition, Title VII is violated when an employer is motivated by retaliatory animus, <u>even if valid objective reasons for the discharge exist</u>." <u>Cosgrove v. Sears, Roebuck & Co.</u>, 9 F.3d 1033, 1039 (2d Cir. 1993)(emphasis supplied). Accordingly, defendant's motion for JMOL on causal connection grounds is also denied.

<u>Motion for a New Trial</u>: For essentially the same reasons as set forth above, defendant's motion for a new trial pursuant to Rule 59 is denied. Although the court has more discretion in determining a Rule 59 motion, a new trial should be granted only if the court "is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." <u>Smith v. Lightning Bolt Prods., Inc.</u>, 861 F.2d 363, 370 (2d Cir. 1988). Moreover, while the court is free to weigh the evidence in evaluating a new trial motion, it should not ordinarily ignore the jury's role in resolving factual disputes. <u>Metromedia Co. v. Fugazy</u>, 983 F.2d 350, 363 (2d Cir. 1992)(abrogated on other grounds)("Where the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial."). Indeed, whether the court would have reached the same decision as the jury is not the issue. <u>Saloomey v. Jeppesen & Co.</u>, 707 F.2d 671, 679 (2d Cir. 1983)(new trial not required merely because of trial court's

"disagreement with the fact finding of the jury"). Here, I find that there was sufficient evidence in the trial record to support a finding that a retaliatory motive at least played a part in the City's decision to terminate plaintiff. The jury's verdict did not constitute a seriously erroneous result or a miscarriage of justice. Accordingly, the City's motion for a new trial is denied.

## Conclusion

Based on the foregoing, the City's motion for judgment as a matter of law or for a new trial (Docket #77) is **denied**.

**SO ORDERED.**

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated: January 6, 2009
       Rochester, New York